# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| MARTHA BOYD, | : | |
| Plaintiff, | : | |
| | | Case No. 3:09cv00149 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

Plaintiff Martha Boyd, a former cashier and team leader at a data company, brings this case challenging the Social Security Administration's denial of her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). This Court has jurisdiction to review the administrative denial of her applications. *See* 42 U.S.C. §§405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record, and the record as a whole.

Throughout Plaintiff's administrative proceedings she asserted that she is eligible to receive DIB and SSI because she under a "disability" within the meaning of the Social

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Security Act. In the present case Plaintiff contends that the administrate non-disability determination is flawed by certain errors and by a lack of substantial supporting evidence. She seeks an Order (1) reversing the administrative decision, (2) finding her eligible to receive DIB and SSI, and (3) remanding for payment of benefits. She alternatively seeks, at a minimum, a remand of this matter to the Social Security Administration to correct certain errors.

The Commissioner seeks an Order affirming the administrative non-disability decision.

## II.     Background

### A.     Plaintiff's Vocational Profile and Testimony

Plaintiff was age forty-nine on the date she applied for DIB and SSI. (Tr. 52). She therefore fell into the category of a "younger person" for social security purposes. 20 C.F.R. §§404.1563(c), 416.963(c). By the date of the ALJ's decision, Plaintiff was age fifty-three, and she was then considered a person "closely approaching advanced age." 20 C.F.R. §§404.1563(d), 416.963(d). Plaintiff's educational background translates to a "limited education" for social security purposes. *See* Tr. 30, 84; *see also* 20 C.F.R. §§ 404.1564(b)(3), 416.965(b)(3).

Plaintiff asserts that her disabilities prevented her from employment beginning on May 13, 2004. During the ALJ's hearing in March 2008, Plaintiff testified that she had last worked in May 2004. (Tr. 405). In 2007 she attempted to work at Goodwill without success.

Plaintiff testified that she cannot work because she has trouble sitting for any length of time, and she has trouble standing and walking. She explained that her right hip was still mending from a total hip replacement surgery she had undergone a year and a half earlier. (Tr. 406-07). About six months before the ALJ's hearing, Plaintiff began experiencing left hip pain, and her left knee was "bad." (Tr. 408). She had left knee surgery in 2007. (Tr. 409). More recently, in January 2008, Plaintiff underwent right

2

shoulder surgery.

Plaintiff further testified that she has two herniated discs in her low back. She noted, "They're not really, really bad but I have arthritis back there. It causes my back to hurt." (Tr. 411). She describes the back pain as "[p]ressure and just deep pain," and she experiences it daily. *Id.*

Plaintiff testified that she can walk for about twenty minutes and can stand for fifteen minutes before needing to sit down. (Tr. 414). She estimated that she could sit for about thirty minutes at a time; she could maybe lift 10 pounds; and when she climbs stairs, her knee, hip, and back all hurt. (Tr. 414-15). Plaintiff testified that her hip pain is the most disruptive to her functioning when compared to her other health problems. (Tr. 406).

Plaintiff takes several pain medications (Methadone, Naproxin, Norflex, Ativan). (Tr. 413). These help her "a little." *Id.* She explained that she takes Ativan as a muscle relaxer and for her anxiety attacks, which cause her to start shaking. (Tr. 413-14). She experiences anxiety attacks about once or twice a week. (Tr. 414). She does not receive any counseling for the anxiety attacks.

As to her daily activities, Plaintiff does not cook, wash dishes, sweep, mop, vacuum, make the bed, dust, visit friends, go to church, or eat out. (Tr. 416-17). She uses an electric cart when grocery shopping, and she does laundry subject to her ability to remove the laundry from the washer and put it into the dryer. (Tr. 416-17). She does not do yardwork. (Tr. 418).

  B. **<u>Medical Evidence</u>**

Some highlights of the medical evidence in the administrative record is warranted. For a more detailed discussion of the medical evidence with citations to specific evidence of record, see Doc. #8 at 3-10; Doc. #11 at 3-10.

**1.**
**<u>Dr. Cook</u>**

Plaintiff relies heavily on the opinions and records of Dr. Cook, her treating orthopedic surgeon. Dr. Cook first saw Plaintiff on June 26, 2006. (Tr. 325). In his office notes Dr. Cook wrote that Plaintiff presented in "moderate acute distress secondary to pain.... She has a very antalgic gait."[2] (Tr. 325). She also had pain to palpation over the anterior portion of her right hip, but she told Dr. Cook that it was not well-localized. *Id*. Dr. Cook wrote:

> She has some pain mild pain over the SI joint on the right side. She has severe pain in the right groin with internal/external rotation of the right hip. This reproduces her pain. She has pain with raising the legs straight off the table, which reproduces her pain in the right groin. Strength testing reveals +3/5 weakness with the hip flexor muscles. She has to help lift her leg onto the table when she lies down....

(Tr. 325). Dr. Cook explained that he had also reviewed Plaintiff's MRI scan, and he diagnosed Plaintiff with severe osteoarthritis in her right hip joint. *Id*.

On July 7, 2006, Dr. Cook wrote a letter to Plaintiff's primary care physician, noting his clinical impression of "osteoarthrtitis secondary to avascular necrosis of the right hip." (Tr. 244). He recommended total surgical replacement of Plaintiff's right hip. *Id*.

On August 23, 2006, Dr. Cook performed a total right-hip replacement. (Tr. 213-16). After recovering for several days in the hospital, Plaintiff was transferred to the Dayton Rehabilitation Institute. (Tr. 233). At that time she was not able to walk without assistance. *Id*. Her treatment plan included "Aggressive Physical Therapy to recover [her] motor skills." (Tr. 235). When Plaintiff was discharged from the Dayton Rehabilitation Institute on September 7, 2006, she was able to perform some activities with modification. Yet she required supervision for walking, bathing, and lower body dressing. (Tr. 289). And she required home health care for physical and occupational

---

[2] The phrase "antalgic gait" describes a "gait in which the patient experiences pain during the stance phase and thus remains on the painful leg for as short a time as possible." Taber's Cyclopedic Medical Dictionary at p.806 (19th Ed. 2001).

4

therapy. (Tr. 290).

Plaintiff next saw Dr. Cook on September 22, 2006. He noted that Plaintiff was doing "quite well. She is progressing nicely.... She relates that her pain is improving...." (Tr. 243). Dr. Cook explained, "We will advance her to weightbearing as tolerated." (Tr. 243). One week later Plaintiff reported increased back pain. (Tr. 245).

Plaintiff also suffers additional musculoskeletal pain. In October 2003 she reported left knee pain. (Tr. 286). In October 2005 she had bilateral knee x-rays. The right knee x-ray showed, "mild decreased bone density," while the left knee showed mild arthritic changes. (Tr. 206).

During a December 2006 examination, Dr. Cook noted tenderness and mild effusion in Plaintiff's left knee. Dr. Cook diagnosed torn medial and lateral meniscus of the left knee and bilateral osteoarthritis of the knees. He ordered a left knee MRI. (Tr. 304). The MRI revealed a torn meniscus, moderate joint effusion, and mild chondromalacia of the patella. (Tr. 294). In January 2007 Dr. Cook performed a meniscectomy and debridement with chondroplasty of Plaintiff's left knee. (Tr. 299-302).

On July 5, 2007, Dr. Cook wrote a letter explaining that since July 2006 he had treated Plaintiff for several musculoskeletal impairments. (Tr. 322). He had treated her for avascular necrosis of the right hip, torn meniscus in her left knee, and arthritis in her left hip. Dr. Cook opined that Plaintiff's pain was consistent with arthritis, and it limited her ability to stand for long periods of time. He further believed that Plaintiff was not "totally disabled" and could perform "some type of sedentary work that will allow her to be productive." *Id*. Dr. Cook noted that he had not treated Plaintiff for her lower back pain, and he declined to comment about, or make any recommendation regarding, her chronic back pain. *Id*.

Also on July 5, 2007, Dr. Cook completed a form titled, "Medical Assessment Of Ability To Do Work-Related Activities (Physical)." (Tr. 306-10). He opined that

5

Plaintiff could lift ten pounds frequently and occasionally, and she could stand or walk for a total of four hours a day. (Tr. 307). Dr. Cook also opined that Plaintiff's impairments did not affect her ability to sit without interruption during an eight-hour workday. *Id*. According to Dr. Cook, Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl. (Tr. 308). Dr. Cook concluded that Plaintiff could not perform light work but could perform sedentary work.[3] (Tr. 310).

Plaintiff underwent an MRI of her right shoulder in August 2006. The MRI showed acromioclavicular joint arthropathy with spurring, small joint effusion, which was consistent with an incomplete rotator cuff tear. (Tr. 330-31). Dr. Cook evaluated Plaintiff for right shoulder pain in September 2007 and diagnosed a torn right rotator cuff, bursitis, and impingement. (Tr. 318). On January 18, 2008, Dr. Cook performed right rotator cuff repair and arthroscopic debridement. (Tr. 362-70).

## 2.
## Dr. Thomas

Dr. Thomas was Plaintiff's primary care physician for several years. (Tr. 245-88). He treated Plaintiff for lumbosacral disc disease, chronic headaches, idiopathic edema, and anxiety. (Tr. 280). In September 2003 Dr. Thomas began managing Plaintiff's pain-medication because her pain management specialist had stopped practicing medicine. (Tr. 287).

In August 2004 Dr. Thomas completed a basic medical form for Ohio Department of Job and Family Services. (Tr. 278-79). He diagnosed, in part, lumbosacral disc disease with chronic low back pain. (Tr. 278). Dr. Thomas opined that Plaintiff could lift up to ten pounds, and he thought her abilities to bend and push/pull were moderately

---

[3] Under the Regulations, "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §404.1567(a). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

6

limited. (Tr. 279). Dr. Cook expected that Plaintiff would be unemployable from nine to eleven months. *Id.*

Nearly two years later (in July 2006), Dr. Thomas completed interrogatories, noting that he had treated Plaintiff for osteoarthritis of the lumbar spine and right hip. (Tr. 249). As to Plaintiff's work abilities and limitations, Dr. Thomas opined that she (1) would be prompt in and regular in attendance; (2) would not be able to withstand the pressure of meeting normal standards of work productivity without significant risk of physical or psychological decompensation; (3) would not be able to demonstrate reliability; (4) would not be able to perform activities within a schedule or maintain attendance or be punctual, mostly due to her physical impairments; and (5) would not be able to complete a normal work day or work week. (Tr. 251-54). Additionally, Dr. Thomas thought that Plaintiff had a marked restriction in her ability to perform activities of daily living and in her ability to maintain concentration, persistence, or pace. (Tr. 256-57).

### 3.
### Plaintiff's Car Accident And Testing

In late February 2005 Plaintiff was in a car accident and lost consciousness. She was evaluated an at emergency room for a possible closed head trauma. She primarily reported head pain, right knee pain, right shoulder pain, and right hand pain. Testing was negative for a closed head injury. A CT of her abdomen and pelvis revealed degenerative changes in her right hip and sacroiliac joints. (Tr. 143). X-rays and a CT of her cervical spine showed degenerative changes at C5-6 and C6-7. (Tr. 144, 149). A right shoulder x-ray showed surgical clips at the supraclavicular region. (Tr. 146).

One week after the car accident, Plaintiff went to the emergency room for right shoulder pain. (Tr. 156-61). On examination a physician found decreased range of motion and diffuse tenderness in her right shoulder. (Tr. 160).

On March 2, 2005, an MRI of Plaintiff's lumbar spine showed disc bulges at L4-L5 and L5-S1 with ventral thecal sac effacement towards the left at L4-L5. (Tr. 163).

7

Another March 2, 2005 report states, in part, "Today's EMG study of both lower extremities and lumbar paraspinals failed to reveal any electrophysiological evidence of lumbar radiculopathy...." (Tr. 164).

## 4.
## State Agency Physicians

Dr. Oza examined Plaintiff on May 10, 2005 at the request of the Ohio Bureau of Disability Determinations. (Tr.165-71). Plaintiff described continuous low back pain with radiation into her right hip/buttock down the back of her right leg. (Tr. 165). Plaintiff further told Dr. Oza that her right leg "gives out" episodically, so she used a cane for assistance as a precautionary measure. *Id*.

Upon examination Dr. Oza noted a reduced range of motion in Plaintiff's cervical spine and lumbar spine. (Tr. 166). Plaintiff's lower lumbar spine showed paravertebral muscle spasm and tenderness. Straight-leg raising was positive on the right at thirty degrees of elevation while in Plaintiff was in the supine position. Her right hip demonstrated a restricted range of motion. She had decreased sensation along her L5 dermatome on the right, and her great toe dorsiflexor was weaker on the right than the left. She also walked with a limp, favoring her right side. *Id*. Dr. Oza's clinical impressions included low back pain with "symptoms and signs suggestive of right sided L5-S1 radiculopathy." (Tr. 167). Dr. Oza added, "This patient is in significant pain." *Id*.

In June 2005 Dr. Teague reviewed the medical evidence for the Ohio Bureau of Disability Determinations. (Tr. 186-93). Dr. Teague concluded that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk about six hours in an eight-hour workday; and could sit about six hours in an eight-hour workday. (Tr. 187). Dr. Teague noted that Plaintiff could never climb a ladder, rope, or scaffold; she could occasionally climb ramps or stairs; and she could occasionally stoop, crouch, or crawl. (Tr. 188). Dr. Teague assessed Plaintiff's symptoms as follows:

> The sxs [symptoms] are attributable to a medically determinable

8

> impairment. The severity of the sxs and its alleged effect on function are
> not consistent with the total medical evidence. The claimant's allegations
> in regards to her physical condition are partially credible.

(Tr. 191). In September 2005 Dr. Holbrook stamped his agreement with Dr. Teague's assessment without providing any written explanation. (Tr. 193).

### III. Administrative Review

#### A. "Disability" Defined

The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986). A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see also Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

#### B. ALJ Padilla's Decision

ALJ Padilla resolved Plaintiff's disability assertions by using the five-Step sequential evaluation procedure required by Social Security Regulations. *See* Tr. 18-26; *see also* 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).[4] His significant findings occurred at Steps 2 through 5.

The ALJ found at Step 2 that Plaintiff's severe impairments included "lumbar degenerative disc disease; arthritis in the right hip with total hip replacement; later onset

---

[4] The remaining citations to the Regulations will identify the pertinent DIB Regulation with full knowledge of the corresponding SSI Regulation.

(December 2006) left knee derangement with surgery shortly thereafter; late onset (September 2007) right shoulder small rotator cuff tear with surgery shortly thereafter; and possible pain disorder versus anxiety disorder...." (Tr. 24).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria in the Social Security Regulation's Listing of Impairments. (Tr. 25).

At Step 4 the ALJ found:

> [T]he claimant has the residual functional capacity to: lift up to twenty pounds occasionally and ten pounds frequently; she must have the option to alternate positions every fifteen to thirty minutes; she must avoid climbing ladders, scaffolds, and unprotected heights; more than occasional climbing stairs, stooping, crouching, crawling; no overhead reaching with right upper extremity; no more than occasional foot controls; no kneeling; and she is limited to low stress jobs with no inherently stressful or hazardous activities. Therefore, she is limited to a reduced range of light work.

(Tr. 25). The ALJ also found at Step 4 that Plaintiff was unable to perform any past relevant work. (Tr. 30). As to Plaintiff's credibility the ALJ found, "while the claimant is credible that she has 'severe' impairments, her statements concerning the intensity, duration and limiting effects of such impairments are not entirely credible." (Tr. 30).

At Step 5 the ALJ concluded that Plaintiff could perform a significant number of jobs available in the national economy. (Tr. 30-31).

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI. (Tr. 21-32).

## IV.    Judicial Review

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir.

10

2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.     Discussion**
    **A.     Medical Source Opinions**

Plaintiff contends that the ALJ erred by not crediting the opinion of her treating specialist, Dr. Cook, that she could at most perform only sedentary work. Plaintiff reasons that Dr. Cook's opinion was supported by objective evidence and by the record as a whole. Plaintiff further argues that the ALJ's reliance on the out-dated opinions of the state-agency physicians, who only considered her back impairment when concluding she

11

could perform limited light work, did not constitute substantial evidence sufficient to contradict Dr. Cook's opinions.

The Commissioner argues that substantial evidence supports the ALJ's decision to give less weight to Dr. Cook's opinion and more weight to the opinions of the state agency reviewers, Dr. Teague and Dr. Holbrook.

Social Security Regulations and case law require ALJs to apply controlling weight to a treating medical source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *See* 20 C.F.R. § 404.1527(d)(2); *see also Rabbers*, 582 F.3d at 660; *Rogers*, 486 F.3d at 242; *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If a treating medical source's opinion is not entitled to controlling weight, it must be weighed under "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242.

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. § 404.1527(d)(1). However, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1527(d), (f); *see also* Ruling 96-6p at *2-*3.

When assessing Plaintiff's residual functional capacity, the ALJ described and

applied the correct legal criteria to the evaluation of Dr. Cook's opinion. *See* Tr. 27-28; *see also Wilson*, 378 F.3d at 544-45; 20 C.F.R. §404.1527(d). The ALJ declined to fully credit Dr. Cook's opinion concerning Plaintiff's work abilities and limitations first by acknowledging that Dr. Cook was Plaintifff's treating orthopedic physician, second by applying the factors of supportability and consistency, as permitted by the Regulations. *See* Tr. 28; *see also* 20 C.F.R. §404.1527(d)(2)-(4). In doing so, the ALJ did not err as a matter of law.

Substantial evidence supports the ALJ's reasons for discounting Dr. Cook's opinions. The ALJ found that Dr. Cook did not provide reliable medical support for his more extreme conclusion, a finding that was reasonable considering that Dr. Cook only listed Plaintiff's underlying diagnoses when asked to provide medical support for his recommended restrictions, and Dr. Cook did not support his opinion that Plaintiff was limited to sedentary work with any specific or notable clinical findings. (Tr. 306-07). Given the lack of explanation or documentation of medical evidence in support Dr. Cook's opinion, the ALJ was entitled to discount or reject Dr. Cook's opinions. *See* 20 C.F.R. §404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."); *see also Price v. Commissioner of Soc. Sec.,* 2009 WL 2514079 at *3 (6th Cir. Aug. 18, 2009) ("Because Dr. Ashbaugh failed to identify objective medical findings to support his opinion [on a questionnaire] regarding Price's impairments, the ALJ did not err in discounting his opinion.").

Not only did Dr. Cook fail to provide objective medical support for his conclusion that Plaintiff could only perform sedentary work, his assessment was at odds with the more favorable description of Plaintiff's medical condition set forth in his own treating notes. For example, just thirty days after Plaintiff's hip surgery, Dr. Cook wrote that Plaintiff was "doing quite well" and "progressing nicely." (Tr. 243). Her pain was

diminished, she walked with a "fluid gait," and she had regained a "pain-free range of motion." (Tr. 243). Four months after surgery, Plaintiff reported that she was "not having any difficulties" with her right hip at all, and even that she was "quite satisfied with the results." (Tr. 303, 304). Likewise, after her knee surgery, Plaintiff was "doing quite well" despite some residual achiness. (Tr. 297). Again, four months after her knee surgery "her mechanical symptoms [were] gone" and she had only a slightly reduced range of motion. (Tr. 296). And with respect to Plaintiff's shoulder surgery, which was performed a few months before the administrative hearing, there is no indication that the procedure was anything but successful. (Tr. 384). Plaintiff's discharge instructions had only temporary restrictions, and there is no indication that Plaintiff's doctors thought Plaintiff required permanent restrictions following her surgery. (Tr. 370). In light of Dr. Cook's favorable comments in his treatment notes about the favorable results of Plaintiff's medical procedures, it was reasonable for the ALJ to give greater weight to the substance of Dr. Cook's treating notes, rather than his more conclusory assessment. *See Coleman v. Secretary of HHS,* 1995 WL 64712 (6th Cir., Feb. 15, 1995) (Secretary reasonably rejected non-contemporaneous treating physician reports in favor of objective evidence throughout record).

Lastly, Dr. Cook's assessment conflicted with other medical source opinions in the record. In June 2005 Dr. Teague assessed Plaintiff's physical residual functional capacity and concluded that she could: lift twenty pounds occasionally and ten pounds frequently; stand/walk six hours; and sit about six hours. (Tr. 187). This assessment is consistent with light work rather than sedentary work. *See* 20 C.F.R. § 404.1567; *see also* Tr. 193. Similarly, in 2006 Dr. Thomas authorized Plaintiff to do "light duty work," and a job center was requesting Plaintiff work fifty-four hours per month. (Tr. 265). *See* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion."); *see also Cutlip v. Secretary of HHS*, 25 F.3d 284, 287 (6th Cir. 1994) ("The Secretary, however, is not bound by treating

physicians' opinions, especially when there is substantial medical evidence to the contrary."). These medical opinions – considered with the other factors described above – provided the ALJ with a reasonable basis for concluding that Plaintiff could perform more than a sedentary work.

Accordingly, Plaintiff's challenges to the ALJ's evaluation of the medical source opinions lack merit.

### B. <u>Plaintiff's Credibility</u>

Plaintiff argues that the ALJ erred when evaluating the credibility of her pain testimony and other symptoms. Plaintiff argues that the ALJ discounted her credibility based on his disbelief of her treating physician's opinion.

The ALJ did not err in discounting Plaintiff's credibility based on his disbelief of her treating physician's opinion. "Social Security regulations state that '[o]pinions on some issues ... are not medical opinions ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.'" *Allen v. Commissioner of Soc. Sec*. 561 F.3d 646, 652 (6th Cir. 2009)(quoting in part 20 C.F.R. § 404.1527(e)). "[C]redibility determinations with respect to subjective complaints of pain rest with the ALJ." *Id*. It was therefore the ALJ's job to assess Plaintiff's credibility and he was therefore not required to fully credit her treating medical source's opinions. *See Allen*, 561 F.3d at 651-52.

Additionally, Plaintiff is apparently referring to the ALJ's rejection of Dr. Cook's assessment of her residual functional capacity. Recalling that Dr. Cook believed Plaintiff could only perform sedentary work, the ALJ did not err either by rejecting Dr. Cook's opinion or by finding Plaintiff capable of performing more than sedentary work. As explained above, *supra*, §V(A), the ALJ did not err in his assessment of Dr. Cook's opinion and the ALJ's assessment was supported by substantial evidence. As a result, the ALJ did not err by finding Plaintiff capable of performing more than sedentary work.

15

The Regulations, moreover, placed the burden on the ALJ to assess Plaintiff's residual functional capacity, particularly because this assessment results in an administrative finding, not a purely medical finding. *See* 20 C.F.R. §§ 404.1527(e)(2), 404.1545. The Regulations thus did not mandate the ALJ to fully Dr. Cook's sedentary-work opinion. *See id*.; *see also Allen*, 561 F.3d at 651-52.

Plaintiff also contends that the ALJ erred by relying on Plaintiff's report of her daily activities to Dr. Flexman, a consultative psychological examiner. Plaintiff emphasizes that Dr. Flexman's report concerned Plaintiff's daily activities for a period of time before her hip and orthopedic impairments worsened. The ALJ also erred by ignoring aspects of the record that supported Plaintiff's claim of disability, according to Plaintiff. These contentions lack merit.

"There is no question that subjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record." *Cruse v. Commissioner of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (citations omitted). "However, 'an ALJ is not required to accept a claimant's subjective complaints and may ... consider the credibility of a claimant when making a determination of disability.' Notably, an ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse*, 502 F.3d at 542 (quoting in part *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

Contrary to Plaintiff's arguments, substantial evidence supports the ALJ's credibility assessment. On several occasions, Plaintiff's testimony during the ALJ's hearing was contrary to previous statements and diagnostic testing in the record. For example, at the hearing, Plaintiff testified that she had pressure and deep pain in her back on a daily basis and told the ALJ she could only sit for thirty minutes at a time. (Tr. 414). Yet, diagnostic testing showed minimal abnormalities in Plaintiff's back (Tr. 120, 163,

16

164), and she did not receive significant medical treatment for back pain. Similarly, Plaintiff explained during the ALJ's hearing that her hip had not yet mended and that it was her most disabling impairment. (Tr. 304, 406). The record, however, shows that Plaintiff's hip pain was successfully treated by surgery, physical therapy, and pain medication, to the point where Plaintiff herself was reporting she was satisfied with the outcome of the surgery. (Tr. 303). During her office visit with Dr. Cook in January 2007, Dr. Cook noted, "With regards to her right hip, she relates she is doing quite well and is quite satisfied with the results." (Tr. 303). This note is concordant with Dr. Cook's notes during Plaintiff's office visit in December 2006. Dr. Cook wrote, "She has no pain with internal or external rotation of the right hip." (Tr. 304).

Plaintiff further testified that knee problems represented her second most disabling impairment. (Tr. 408-09). However, like her hip surgery, the record shows that her knee surgery resulted in an elimination of mechanical symptoms and a mostly normal range of motion (Tr. 296). In light of medical evidence describing the relative success of Plaintiff's surgical procedures, the ALJ had a reasonable basis for questioning the reliability of Plaintiff's testimony about the relative failure of those same procedures.

The ALJ also had good reasons for questioning Plaintiff's testimony about her daily activities. For example, while Plaintiff testified she could barely perform basic activities of daily living, she reported being able to do a full range activities to Dr. Flexman including household chores such as cooking, cleaning, laundry, driving, visiting church and flea markets, and caring for her grandchildren. (Tr. 153, 416-17). Although Plaintiff's statements to Dr. Flexman referred to her daily activities during the eighteen-month period preceding Dr. Flexman's March 2005 report, much of this eighteen-month period occurred after her claimed disability onset date in May 2004. Accepting, in Plaintiff's favor, that her condition worsened after the time of Dr. Flexman's March 2005 examination, the ALJ did not err by considering the differences between Plaintiff's statements to Dr. Flexman and her later testimony during the ALJ's hearing. In other

17

words, it was reasonable for the ALJ to consider what Plaintiff said she could do at all times after her claimed disability onset date, and to consider and weigh the significance of inconsistencies in her statements about her daily activities when assessing her credibility. *See Walters*, 127 F.3d at 531 ("[T]he Commissioner has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record.... Discounting credibility to a certain degree is appropriate where an ALJ find contradictions among the medical reports, claimant's testimony, and other evidence.").

Accordingly, Plaintiff's challenges to the ALJ's credibility assessment lack merit.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be affirmed; and

2. The case be terminated on the docket of this Court.


April 27, 2010                                    s/Sharon L. Ovington
                                                  Sharon L. Ovington
                                                  United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).